**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

KIRHY SMITH,

               Plaintiff,

vs.                                                           Case No. 3:10-cv-578-J-32MCR

RICK BESELER, et. al.,

               Defendant.

## **ORDER**

Plaintiff Kirhy Smith asserts claims under 42 U.S.C. § 1983 and Florida law against members of the Clay County Sheriff's Office (the "Sheriff's Office") relating to his arrest and subsequent five-day confinement in a Juvenile Detention Center. Smith alleges that, after failing to conduct a reasonable investigation, defendant Danilo Matos, a detective in the Sheriff's Office, obtained a warrant for his arrest by making false statements and omitting material facts from his supporting affidavit.

This case is before the Court on defendants' motions for summary judgment. The Court considers the motions (Docs. 15, 17) and plaintiff's consolidated response (Doc. 19). The Court held a hearing on July 29, 2011, the record of which is incorporated by reference (Doc. 24), following which the parties filed supplemental briefs (Docs. 26-28).

### **I.     BACKGROUND**

This case arises from the investigation of a robbery which took place in Orange Park, Florida on August 7, 2008. The victim, Ryan Maynard, was first interviewed by Deputy D.W. Llewellyn on the night of the incident. According to Deputy Llewllyn's report, Maynard stated

that, as he was walking his bicycle along the road, he was approached by two men who struck him on the head, stole his ipod, and destroyed his cell phone. (Doc. 20-1 at 4.) Maynard than fled the area, leaving his bicycle on the ground. (Id.) The report states: "The victim described the suspects to be white males, . . . both wearing black pants & black hooded shirts. The victim said that one suspect was wearing a blue bandana on his face and the other was wearing a red bandana on his face." (Id.)

Matos was subsequently assigned to investigate the robbery. When Matos conducted a second interview of Maynard on August 8, 2008, the day after the incident took place, Maynard repeated most of the same details he had reported to Deputy Llewllyn, including the type of clothing worn by his assailants. (Doc. 20-2 at 8.) In addition, he further explained that he had seen the two suspects standing in a driveway before he was attacked. (Doc. 20-3 at 1-2.) However, unlike in his interview with Deputy Llewllyn, Maynard stated that while one of the suspect was a white male, he could not recall the race of the other suspect. (Id.) Matos did not mention the details of Deputy Llewllyn's report to Maynard. (Id.)

On August 24, 2008, Matos learned that Christopher Palmer, who was in custody charged with an automobile burglary in Orange Park, claimed to have information regarding the robbery of Maynard. (Doc. 20-4 at 1.)[1] According to Matos, Palmer volunteered the information because he was trying to cooperate with the Sheriff's Department while under investigation. (Doc. 20-2 at 10-13.)

---

[1] Although Palmer was not familiar with Maynard, Palmer stated that he had witnessed the robbery of a white male at approximately the same time and location as the robbery of Maynard.

Palmer told Matos that while he was walking home from a friend's house around 3:00 a.m., he encountered Smith and a white male, whom he knew only as "Shocker." Palmer further stated that, after talking with Shocker and Smith, the three men then smoked marijuana while standing on the road. During this time, they allegedly observed the victim riding by on his bicycle. Palmer stated that he then resumed his walk home while Smith and Shocker chased after the victim. Palmer claimed that he then heard the bike crash, and Smith later rode by on the victim's bike and told Palmer that he had jumped the victim. When Matos presented Palmer with a picture of Smith, Palmer confirmed that Smith was the person he had seen.[2] Although Matos reported that Palmer provided a "detailed description" of the victim and his bicycle, Palmer's description of the clothing worn by Smith and Shocker does not match the description provided by Maynard.[3]

During the course of the interview, Matos came to believe that, because of the amount of detail provided by Palmer regarding the incident, Palmer either was a witness to the incident or was involved in the robbery. (Doc. 20-2 at 10-13.) However, Palmer denied any involvement in the robbery and was released from custody the following day. (Doc. 19 at 4.) Matos did not speak to Palmer again after the interview was complete or conduct any follow-up research relating to Palmer's possible involvement in the robbery. (Doc. 20-2 at 14-15.)

---

[2] Palmer claimed that he knew Smith socially from Orange Park High School and had seen him at various parties around town.

[3] Matos's report states that Palmer said Smith wore a "[r]ed knit cap with small bill, black long sleeve thermal shirt, long baggy blue jean shorts, black sneakers and a black bandanna tied around his neck." (Doc. 20-4 at 1.) Shocker was described as wearing a "[b]lack short sleeve tee shirt, dark blue baggy jeans, white bandanna tied around his neck, black sneakers and a black fitted ball cap with a flat bill and white "NY" (New York Yankees) letters." (Id.)

Nearly a month later, Matos sought a warrant for Smith's arrest after discussing the case with his supervisor and an assistant state attorney.[4] Matos submitted a supporting affidavit which states that he interviewed a witness to the robbery and provides a brief description of Palmer's account.[5] (Doc. 17-4 at 2.) The affidavit further states that "the witness provided virtually the identical details of the offense as the victim did. The witness also provided detailed descriptions of the victim and victim's bicycle." (Id.) Based on this affidavit, the state judge signed the warrant for Smith's arrest on September 20, 2008.

Accompanied by two other Clay County officers, Matos took the warrant to Mandarin High School. Matos first met with two school resource officers at the school's administrative office. (Doc. 20-2 at 19.)[6] After Matos presented the warrant, the school resource officers left to retrieve Smith. (Id.)[7] At this time, Smith was in the school auditorium, taking the Florida Comprehensive Assessment Test with three to five hundred other students. (Doc. 20-9 at 23.) In plain view of the students, a number of Smith's teachers, and his football coaches, Smith was put in handcuffs and escorted by the school resource officers from the auditorium to the administrative office. (Id.)

Matos then took Smith to the Orange Park Operations Center for an interview. (Id.

---

[4] Because Smith was a minor at the time, the arrest warrant was technically a "juvenile pick-up order." Because an arrest warrant and juvenile pick-up order are functionally identical (Docs. 15 at 2; 19 at 4), these terms will be used interchangeably.

[5] The affidavit does not state any details regarding Palmer's identity, his activities during the night in question, or that he was also a suspect in the robbery investigation.

[6] The school resource officers were members of the Jacksonville Sheriff's Office.

[7] Matos remained in the administrative office.

at 24.)  Throughout a three-hour interrogation, Smith denied having any knowledge of Maynard's robbery.  (Docs. 20-2 at 25; 20-9 at 25.)  After the interrogation was over, Smith was taken to the Duval County Juvenile Detention Center, where he remained confined for five days.  (Doc. 20-9 at 28-29.)[8]  Smith was released on October 14, 2008, and the State of Florida dropped all charges against him on January 10, 2009.  (Docs. 20-9 at 28, 20-12.)

Smith subsequently filed this action against Matos in his individual capacity and against Rick Beseler in his official capacity as Sheriff of Clay County, Florida.  (Doc. 1.)  Smith claims Matos violated his Fourth Amendment rights by omitting material information from, and making false statements in, his affidavit in support of a warrant for Smith's arrest.  (Doc. 1 at 6-7.)  Smith further claims Clay County is liable for Matos's actions in this case and plaintiff's false imprisonment in the Duval County Juvenile Detention Center.  (Doc. 1 at 7-9.)

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor.  Centurion Air Cargo, Inc. v. United Parcel Serv. Co.,

---

[8] Smith was told that he was not eligible for home confinement due to his criminal record. (Id.)

420 F.3d 1146, 1149 (11th Cir. 2005). The burden of demonstrating the satisfaction of this standard lies with the movant." Branche v. Airtran Airways, 342 F.3d 1248, 1252-53 (11th Cir. 2003).

### III.   DISCUSSION

#### A.   Smith's Claims against Matos

Count I of the Complaint states a § 1983 claim against Matos in his individual capacity for allegedly falsely arresting Smith in violation of his rights under the Fourth Amendment. Matos claims he is entitled to qualified immunity because he reasonably believed there was probable cause to arrest Smith. (Doc. 15 at 9-10.) Smith, however, contends that qualified immunity is not appropriate—and thus summary judgment should not be granted—because Matos omitted material information from the affidavit submitted to the state judge and, when such omitted information is considered, probable cause did not exist. (Doc. 19 at 10-15.)

"Qualified immunity offers complete protection for government officials sued in their individual capacities." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation omitted). "To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003). The burden then shifts to the plaintiff to prove that "the plaintiff's allegations, if true, establish a constitutional violation. If the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated, [plaintiffs must also show that] the right violated was 'clearly established.'" Grider v. City of Auburn, Ala., 618 F.3d 1240, 1254

(11th Cir. 2010) (internal citations omitted).  The parties do not dispute that Matos was acting within his discretionary authority when he arrested Smith, and thus Smith has the burden to show that Matos violated his clearly established constitutional rights.

"There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment."  Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997).[9]  However, "[i]t is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party."  Deville v. Marcantel, 567 F.3d 156, 170 (5th Cir. 2009)(quotation omitted).  Smith therefore must show that "the deliberations of that intermediary were in some way tainted by the actions of the defendant."  Id.

"In Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L.Ed.2d 667 (1978), the Supreme Court held that a . . . warrant is void under the Fourth Amendment if the affidavit supporting the warrant contains 'deliberate falsity or reckless disregard' for the truth.'"  Madiwale, 117 F.3d at 1326.  "[T]he reasoning in Franks also applies to information omitted from warrant affidavits."  Id.; see Dahl v. Holley, 312 F.3d 1228, 1235 (11th Cir. 2002).  As the Eleventh Circuit has explained:

---

[9] The Eleventh Circuit has held that an officer has probable cause when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, . . . an offense."  Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003) (quotation and internal citation omitted).  "Probable cause requires more than mere suspicion, but does not require convincing proof."  Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla., 956 F.2d 1112, 1120 (11th Cir. 1992).

> [A] warrant affidavit violates the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit. A party need not show by direct evidence that the affiant makes an omission recklessly. *Rather, it is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself. Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant. Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause.*

Madiwale, 117 F.3d at 1326-27 (quotations omitted) (emphasis added).[10] To establish a Franks violation, Smith therefore must show that Matos recklessly omitted information from his affidavit that was material to the finding of probable cause.

To overcome the defense of qualified immunity, Smith must also show his rights were clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). Thus, in the context of a Franks violation, "an officer would not be entitled to qualified immunity when the facts omitted were so clearly material that every reasonable law officer would have known that their omission would lead to a search [or seizure] in violation of federal law." Madiwale, 117 F.3d at 1327 (quotation omitted); see also Holmes v. Kucynda, 321 F.3d 1069, 1083

---

[10] To determine whether an omission was material, courts "reform the warrant application by setting aside the misstatements or by including the omissions, and then determine whether the reformed application nonetheless establishes probable cause." West Point-Pepperell, Inc. v. Donovan, 689 F.2d 950, 959 (11th Cir. 1982); see also Kelly, 21 F.3d at 1554 ("[T]he warrant is valid if, absent the misstatements or omissions, there remains sufficient content to support a finding of probable cause.").

(11th Cir. 2003)("If a reasonable police officer would have known that [the officer's] testimony was not just negligently false, but recklessly so, then [the officer] is not entitled to qualified immunity.")(quotation omitted); Smith v. Deering, 880 F. Supp. 816, 826 (S.D. Ga. 1994)("Accordingly, in determining qualified immunity, a court should exclude any allegedly false material, add any omitted material and then determine whether the contents of the 'corrected affidavit' are so lacking in indicia of probable cause as to render official belief in its existence unreasonable.")(quotation omitted).  To avoid summary judgment on the basis of qualified immunity, Smith therefore must show that, if the material information omitted from Matos's affidavit had been included, no reasonable officer would have thought that probable cause was present.[11]

Whether qualified immunity applies "is a legal issue to be decided by the court." Cottrell v. Caldwell, 85 F.3d 1480, 1488 (11th Cir. 1996).  While "the jury itself decides issues

---

[11] In his supplemental briefing, Matos argues that "[t]he role of arguable probable cause in the qualified immunity analysis remains unchanged even though the Plaintiff's arrest in this case was made pursuant to a warrant, as opposed to a warrantless arrest." (Doc. 27 at 7.) However, many of the cases relied on by Matos are inapposite because they were decided under Malley v. Briggs, 475 U.S. 335 (1986), which held that an officer who creates an affidavit that does not present probable cause is not entitled to qualified immunity if a reasonable officer would have known that the affidavit was insufficient, even if the information contained therein was true and complete.  These cases thus did not deal with allegations of material omissions or false statements.  See Lowe v. Davis, 958 F.2d 1565,1570 (11th Cir. 1992); Thornton v. City of Tampa, No. 8:09-cv-41-JDW-EAJ, 2010 WL 427737, at *3 (M.D. Fla. Feb. 3, 2010).  Moreover, the remaining cases relied on by Matos do not indicate what qualified immunity analysis should apply in this case.  See Brown v. Abercrombie, 151 F. A'ppx 892 (11th Cir. 2005)(finding qualified immunity because the warrant was supported by arguable probable cause and no material information was omitted); Paullin v. Loxley, 171 F. A'ppx 773, 777-78 (11th Cir. 2006)(finding qualified immunity because the arrest was supported by arguable probable cause and the officer did not include false information in the arrest report).  While the cases in this area do not all neatly line up, the Court believes that Franks provides the proper rule of decision.

9

of historical fact that are determinative of the qualified immunity defense, . . . the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty." Johnson v. Breeden, 280 F.3d 1308, 1318 (11th Cir. 2002). Here, there are no material disputes regarding "the who-what-when-where-why type of historical fact issues" that require a determination by the jury, and thus the Court may rule as a matter of law on the qualified immunity issue. See Cottrell, 85 F.3d at 1488.

Matos omitted two categories of key facts from his affidavit. First, although the only evidence provided in the affidavit of Smith's involvement is Matos's interview with Palmer, the affidavit omits a number of facts that would have seriously undermined Palmer's credibility.[12] (See Doc. 17-4 at 2.) Palmer was interviewed while in custody following his arrest for an automobile burglary which occurred in the vicinity of Maynard's robbery. (Doc. 20-4 at 1.) Although Palmer was not given a formal deal with law enforcement, he thus had an incentive to cooperate with the police. (Cf. Doc. 20-2 at 10-13.) Moreover, Palmer fit the description given by Maynard of his assailants, and, as any reasonable officer would, Matos suspected that Palmer may have been involved in the robbery. (Doc. 20-2 at 13.) Palmer also stated that he had been under the influence of illegal narcotics while the robbery took place (Doc. 20-2 at 11), possibly impairing his recollection of the incident. None of these facts, however, were communicated to the state judge.

---

[12] Palmer was identified in the affidavit only as "a witness to the . . . offense;" the affidavit stated that "the witness has personally known the defendant for one year and identified the defendant by name and photograph." (Doc. 17-4 at 2.) From looking only at the affidavit, one might think that the witness was a companion of the victim, a neighbor, or someone else who would have a reputation for trustworthiness and little incentive to lie.

Second, in stating that "the witness provided virtually the identical details of the offense as the victim did" (Doc. 17-4 at 2), the affidavit omits a number of troubling inconsistencies between the accounts given by the witness and the victim. For example, Maynard had initially reported that both of his assailants were white; however, Palmer accused Smith, an African-American, of being involved.[13]  Second, Maynard stated that he had *walked* his bike past *two* men (not three) standing near the road who then chased after him. In contrast, Palmer claimed that he witnessed the victim *ride* by on his bike *while standing next to Smith and Thrasher* (making three men present). Thus, by placing himself at the scene, Palmer's account differs markedly from the victim's. Finally, Maynard's description of the clothing worn by his assailants does not match the description given by Palmer. Although Matos now asserts that these are only "minor inconsistencies," the Court disagrees. These differences cast serious doubt on whether any reasonable officer could find Palmer's story to be "reasonably trustworthy," Wood, 323 F.3d 878, and thus support a finding of probable cause.  Cf. Brunning v. Pixler, 949 F.2d 352, 359 (10th Cir. 1991)(holding that inconsistencies in a victim's accounts were material to a finding of arguable probable cause).

Viewing the facts in the light most favorable to Smith, a jury could find that Matos violated Smith's Fourth Amendment rights under Franks by omitting clearly material facts from the arrest affidavit with a reckless disregard for the truth. Moreover, Smith's rights were clearly established because it would have been clear to any reasonable officer that omitting

---

[13] Maynard did later express uncertainty as to the race of one of the assailants.

11

such information would result in an arrest without probable cause.

The Court acknowledges that, in many situations, an eyewitness statement in and of itself may be sufficient to create probable cause. Here, however, given the substantial reasons for doubting Palmer's credibility and the serious inconsistencies between his account and that of the victim, any reasonable officer would have known that, in the absence of any further investigation or corroboration,[14] Palmer's accusation by itself did not create probable cause. See Tillman v. Coley, 886 F.2d 317, 321 (11th Cir. 1989)(holding that an officer in a § 1983 case was not entitled to qualified immunity because any reasonable officer would have known that more investigation was required to support the statements made in the arrest warrant). The Court therefore holds that Matos is not entitled to summary judgment based on qualified immunity.[15]

---

[14] Matos failed to conduct *any* follow-up before arresting Smith. (See Doc. 20-2 at 14-15.) Matos did not attempt to corroborate Palmer's account: he failed to verify whether Palmer lived sufficiently close to the location of the robbery so that it would have been plausible that he was walking home; he did not speak to the "friend" Palmer was visiting in the area; and he did not discuss Palmer's account with Maynard. Matos also took no steps to investigate whether Palmer may have been responsible for the robbery, such as showing Palmer's picture to Maynard for identification. Moreover, aside from checking Smith's criminal history, Matos conducted no independent investigation of Smith or his possible involvement in the robbery, such as inquiring into his whereabouts on the night in question. (Doc. 20-2 at 14-15.)

Although an officer cannot always be expected to conduct an extensive investigation before seeking a warrant, here Matos faced no exigent circumstances that can justify his lack of investigation. Matos waited nearly a month after speaking with Palmer before seeking the warrant for Smith's arrest, and, during this time, he performed no additional work on the case. (See Doc. 20-2 at 14.)

[15] However, "[d]efendants who are not successful with their qualified immunity defense before trial can re-assert it at the end of the plaintiff's case in a Rule 50(a) motion." Johnson, 280 F.3d at 1317.

### B.	Plaintiff's Claims against Sheriff Beseler

### 1.	Count II

Count II of the Complaint alleges that Smith was falsely arrested in violation of the Fourth Amendment and that Sheriff Beseler is legally responsible in his official capacity as Sheriff of Clay County. (Doc.1 at 7.) "It is well established that a suit against a defendant governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent." Manders v. Lee, 285 F.3d 983, 990 (11th Cir. 2002). Smith contends that Clay County is liable for his false arrest because it failed to provide adequate training relating to affidavits made in support of arrest warrants. (Doc. 19 at 15-16.) Specifically, Smith contends the County should be held liable because "there was no policy or training provided by Defendant Sheriff Beseler relating to Franks and its progeny relating to material omissions in affidavits in support of arrest warrants." (Doc. 19 at 17.)

"[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 403 (1997). The Supreme Court recently addressed the issue of municipal liability based on a failure to provide adequate training in Connick v. Thompson, 131 S. Ct. 1350 (2011). The Court explained:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. . . . To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. . . .

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. . . .
>
> A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

Id. at 1359-60 (internal citations and quotations omitted).

Even assuming that Clay County's training was inadequate,[16] Smith has not shown that any such inadequacies amounted to deliberate indifference. Smith has presented no evidence that the county was on notice that its training was deficient. In fact, in his affidavit, Sheriff Beseler states that "there has been no basis for me to know or believe that Clay

---

[16] It is doubtful, however, whether Smith has carried his burden of showing that Clay County's training was constitutionally flawed. Although Smith has argued that the County does not specifically train its officers on the Franks case, he has provided no evidence that the County's training is inadequate in such a way as to tolerate officers omitting material facts or making false statements in affidavits supporting arrest warrants. The case relied on by Smith, Hurst v. Finley, 857 F. Supp 1517, 1521-22 (M.D. Ala. 1994), is not on point. In Hurst, the plaintiff brought claims against a municipality under § 1983 after being arrested for driving under the influence of alcohol when the arresting officer had not conducted any sobriety tests prior to her arrest. The court held that the City's failure to train officers to conduct such tests was a motivating force behind the plaintiff's unreasonable arrest. Id. at 1523. Here, however, the evidence shows that Clay County did instruct its officers to report the facts giving rise to probable cause on their arrest affidavits (See Doc. 17-3 at 11; 17-6 at 2-3), and there is no indication that the County was, or should have been, aware that its training was inadequate (Doc. 17-5 at 2).

14

County deputy sheriffs obtained arrest warrants or juvenile pick-up orders without first determining the existence of probable cause and preparing a complete probable cause affidavit to obtain the warrant or juvenile pick-up order." (Doc. 17-5 at 2.) Smith has not attempted to refute this evidence. Sheriff Beseler is thus entitled to summary judgment on Count II.

### 2. Count III

Count III of the Complaint alleges that Smith was falsely imprisoned in violation of Florida law and that Sheriff Beseler is liable in his official capacity. (Doc. 1 at 8.) Sheriff Beseler claims that Smith's detention was not unlawful because he was detained pursuant to a juvenile pick-up order. (Doc. 17 at 16.)

"The elements of a cause of action for false imprisonment have been stated in various ways by Florida courts, but, essentially, all have agreed that the elements include: 1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' and 4) which is unreasonable and unwarranted under the circumstances." Montejo v. Martin Mem'l Med. Ctr., Inc., 935 So.2d 1266, 1268 (Fla. 4th DCA 2006)(quotations omitted). False imprisonment is often distinguished from malicious prosecution. As the court explained in Jackson v. Navarro, 665 So.2d 340 (Fla. 4th DCA 1995):

> Although not always observed, the distinction between malicious prosecution and false imprisonment is fundamental. But briefly, the essential difference between a wrongful detention for which malicious prosecution will lie, and one for which false imprisonment will lie, is that in the former the detention is malicious but under the due forms of law, whereas in the later

> the detention is without color of legal authority. In malicious prosecution plaintiff must allege and prove malice and want of probable cause and the termination of the proceeding favorably to plaintiff, whereas in false imprisonment the allegation of want of probable cause is not essential, and the burden is on defendant to prove probable cause as a defense or in mitigation. Malice is material only on the issue of damages, and the termination of the proceeding is not material.

Id. at 341 (quotations omitted).

"If the imprisonment is under legal authority it may be malicious but it cannot be false. This is true where legal authority is shown by valid process, *even if irregular or voidable*. Void process will not constitute legal authority within this rule." Id. (emphasis added).[17] Applying these rules, Florida courts have held that an arrest made pursuant to a valid warrant cannot be false. See id. at 341; Thornton v. City of Tampa, No. 8:09-cv-41-JDW-EAJ, 2010 WL 427737, at *5 (M.D. Fla. Feb. 3, 2010)(collecting cases); Willingham v. City of Orlando, 929 So.2d 43, 49 (Fla. 5th DCA 2006)(same).

Because Smith was imprisoned pursuant to a facially valid juvenile pick-up order, his claim for false imprisonment must fail. As the court in Thornton explained, "[a]t most, the inclusion of recklessly false statements in [an] affidavit render[s] the warrant voidable, not void." 2010 WL 427737, at *5. Here, the alleged omission of material information from the

---

[17] Examples of void process include a warrant issued by a judge who lacked jurisdiction, see Montejo v. Martin Mem'l Med. Ctr., 935 So.2d 1266 (Fla. 4th DCA 2006), and a warrant that was executed against the same person twice, see Jibory v. City of Jacksonville, 920 So.2d 666 (Fla. 1st DCA 2005). An officer is not liable for false imprisonment, however, if he believed in good faith that the void process was valid. Parks v. City of Homestead, 414 So.2d 1142 (Fla. 3d DCA 1982).

affidavit supporting Smith's juvenile pick-up order similarly did not render the order void.[18]

Smith thus cannot maintain a claim for false arrest under Florida law.

Accordingly, it is hereby

**ORDERED**:

1. Defendant Beseler's Motion for Summary Judgment (Doc. 17) is **GRANTED** with respect to Counts II and III of the Complaint. Pursuant to Rule 54(b) of the Federal Rules

---

[18] Smith acknowledges that "the general rule is that an arrest made based on a facially valid warrant precludes a state law false arrest claim." (Doc. 19 at 18.) However, Smith claims that, under Nixon v. Rutherford, No. 3:07-cv-1000-J-12TEM, 2008 WL 321490, at *1 (M.D. Fla. Feb.1, 2008), and Andrew Nguyen MD PA v. Estate of Carlisle, No. 1:04-cv-00026-MP-AK, 2007 WL 1560149, at *4 (N.D. Fla. May 23, 2007), "there is an exception" when the warrant was illegally obtained "and then executed by the same officer who procured the warrant." (Doc. 19 at 18.)

Although the cases cited by Smith arguably support his position, the Court finds that Florida law does not recognize a claim for false imprisonment in this case. In factually similar circumstances, at least one Florida court has held that an arrest made pursuant to a facially valid warrant cannot result in false imprisonment, even if the arresting officer also drafted the affidavit supporting the warrant. See Jackson, 665 So.2d at 342 ("Nor is it significant that the officer preparing the probable cause affidavit also went to Georgia and assisted in the arrest, since the arrest was still based on the capias, and that precludes a false arrest claim."); see also Fisher v. Payne, 113 So. 378, 380 (Fla. 1927) (holding that a claim for false imprisonment could not be maintained in factually similar circumstances); Thornton, 2010 WL 427737, at *5 ("At most, the inclusion of recklessly false statements in [an] affidavit render[s] the warrant voidable, not void."). Moreover, "Florida courts have never recognized a separate tort for 'negligently' [or recklessly] swearing out a warrant for arrest. Such cases may be brought *only* in the form of civil suits for malicious prosecution." Pokorny v. First Fed. Sav. & Loan Assoc. of Largo, 382 So.2d 678, 683 (Fla. 1980)(emphasis added); see also Hickman v. Barclay's Int'l Realty, Inc., 16 So.3d 154, 156 (4th DCA 2009) (quoting Pokorny). Thus, a "plaintiff contending that he had been improperly arrested as the result of negligence in swearing out a warrant must bear the burden of establishing malice and want of probable cause." Pokorny, 382 So.2d at 156. Though Smith seeks to prove that Matos acted recklessly, he has not attempted to prove that Matos acted with malice.

of Civil Procedure, the Clerk is directed to enter judgment in favor of Defendant Beseler and against Plaintiff on Counts II and III of the Complaint.

2. Defendant Matos' Motion for Summary Judgment (Doc. 15) is **DENIED**.

3. By separate Order, the Court will set dates for trial on Count I of the Complaint.

**DONE AND ORDERED** at Jacksonville, Florida this 28th day of December, 2011.

TIMOTHY J. CORRIGAN
United States District Judge

js.

Copies:

counsel of record